**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| CHASE YARBROUGH, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | |
| | § | 3:20-cv-322 |
| SANTA FE INDEPENDENT SCHOOL | § | |
| DISTRICT, ET AL. | § | |
| | § | |
| *Defendants* | § | |

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATIONS

COMES NOW, Plaintiff Chase Yarbrough, and files his Objections to Magistrate Judge's Memorandum and Recommendation [Doc. No. 35] regarding Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to 12(b)(6) [Doc. No. 23].    Yarborough would respectfully show the Court as follows:

## I.

## BRIEF PROCEDURAL HISTORY

Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 that challenges the constitutionality of the actions of Defendants that resulted in Yarbrough's injuries [Doc. 21]. In 2016, when Yarbrough's injuries occurred, it was well-known, well documented, publicized and televised- and litigated by amateur and professional athletes alike-   and organizations that repeated head to head contact in football causes concussions and other traumatic brain injuries, including fatal chronic traumatic encephalopathy ("CTE.")

\

1

Specifically, in 2011, the State of Texas enacted laws regarding the training, supervision, prevention, recognition, and treatment of concussions in the school setting. Yet, SFISD and the Individual Defendants intentionally, recklessly, with complete deliberate indifference supervised, instructed, orchestrated, and/or required student athletes to engage in repeated upper body contact repeatedly in every practice, at least twice a day which resulted in continued head to head contact.

Students have a right to bodily integrity that may be violated by school employees. *See, e.g., Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994) (finding student's right to bodily integrity violated through sexual molestation by teacher); *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303 (5th Cir. 1987) (teacher tying student to a chair found to violate student's bodily integrity rights).

Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6) [Doc. No. 23].   Thereafter, Plaintiff filed his Response in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6) [Doc. No. 29].   Plaintiff filed his Amended Response in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6) to correct two minor typographical errors [Doc. No. 30]. On February 23, 2021, Judge Brown signed an Order Referring Pretrial Matters to United States Magistrate Judge Andrew M. Edison for determination, report, and recommendation [Doc. No. 34].

On May 25, 2021, United States Magistrate Judge Andrew M. Edison issued his

Memorandum and Recommendation [Doc. No. 35].[1]   Magistrate Judge Edison recommended that Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) be granted. Plaintiff respectfully objects to the Memorandum and Recommendation entered on May 25, 2021.

## II.

## LEGAL STANDARD

This Court's review is *de novo*. FED. R. CIV. P. 72(b)(3). *See also,* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *DHI Group, Inc. v. Kent*, No. H-16-1670, 2018 U.S. Dist. Lexis 35170 at *3 (S.D. Tex. 2018) ("For dispositive motions, district courts' 'must determine de novo any part of the magistrate judge's disposition that has been properly objected to.'").   Further, a "district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."   FED. R. CIV. P. 72(b)(3).

## III.

## PLAINTIFF'S OBJECTIONS TO MEMORANDUM AND RECOMMENDATION

### A.      Plaintiff Established his Burden of Proof Under Rule 12(b)(6)

Plaintiff's claims and factual allegations asserted in his First Amended Complaint established his burden of proof under Rule 12(b)(6).   Although the Memorandum and

---

1 The Court granted Plaintiff's Unopposed Motions to Extend Deadline to file Objections to the Memorandum and Recommendation [Doc. Nos. 37 and 39]

\

Recommendation cites cases discussing the burden of proof, the analysis should go further.

Specifically, in *Bell Atl. Corp. vs. Twombly,* 550 U.S. 544, 555-56 (2007), the Supreme

Court explained:

> "While a complaint attacked by Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan vs. American Bd. Of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A. 7, 1994), a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, *see Papasan vs. Allain,* 478 U.S. 265, 286 (1986) (on a motion to dismiss, 'courts are not bound to accept as true a legal conclusion couched as a factual allegation').   Factual allegations must be enough to raise a right to relief above the speculative level. (citations omitted)('[T]he pleading must contain something more. . .than…a statement of facts that merely creates a suspicion [of] a legally cognizable right of action'), on the assumption that all the allegations in the complaint are true 'even if doubtful in fact'), see, e.g. *Swierkiewicz vs. Sorema N.A.,* 534 U.S. 506. 508 n. 1(2002)' *Neitzke vs. Willias,* 490 U.S. 319, 327 (1989) ('Rule 12(b)(6) does not contenense … dismissals based on a judge's disbelief of a complaint's factual allegations')*; Scheuer vs. Rhodes,* 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even it if appears 'that a recovery is very remote and unlikely'). (Internal footnote citation omitted)."

*Twombly,* at 555-556.    Yarborough met those *prima facie* pleading obligations regarding

the claims asserted against Defendants.    Similarly, in *United States ex rel. Bias v.*

*Tangipahoa Par. Sch. Bd*. (reversing and remanding dismissal of FCA retaliation claim

against a School Board) the Circuit held:

> A complaint survives a motion to dismiss if its facts, accepted as true, 'state a      claim to relief that is plausible on its face.' *Bell Atl. Corp vs. Twombly,* 550   U.S.   544,   570   (2007). Facial plausibility requires that the plaintiff 'plead      factual content that allows the court to draw reasonable inference that the      defendant is liable for the misconduct alleged.' *Ashcroft vs. Iqbal,* 556 US. 662, 678 (2009).   The court's inquiry

\

4

> should focus on the complaint as a whole, 'regardless of how much of it is discussed in the motion to dismiss.' *Wilson,* 667 F.3d at 595. "Dismissal is improper if the allegations support relief on any possible theory.' *Id.* (quotation marks omitted [in orig. (quoting *Cinel vs. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994))."

816 F.3d 315, 321 (5th Cir. 2016); s*ee also Littell vs. Houston Independent School District*, 894 F.3d 616, 622 (5th Cir. 2018) (no heightened pleading standard for 1983 liability). Reversing the dismissal, the Fifth Circuit made clear that to survive a motion to dismiss, "a complaint need not contain 'detailed factual allegations'; rather, it need only allege facts sufficient to 'state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)").   *Id.*

Chase Yarbrough alleged sufficient facts that his rights were violated, how these rights were violated, what claims are asserted and why, and what relief he seeks from the Defendants.   Whatever Yarborough presently lacks in terms of factual knowledge, he intends to develop and supplement with proper discovery.

## B.  Yarborough possesses a Constitutional right to "bodily integrity" under 42 U.S.C § 1983

The Memorandum and Recommendation provides that there is no Constitutional violation.   Plaintiff objects to this conclusion.   The Memorandum and Recommendation mis-conceptualizes Yarbrough's allegations as "in essence, a condemnation of the football culture which pervades much of society in this part of the country. Boiled down, Yarbrough contends that the game of football, with its constant physical contact, aggression and violence is an inherently dangerous sport." [Doc. No. 35, Page 5]. Plaintiff objects to interpretation of Plaintiff's claims under 42 U.S.C. § 1983.

\

Throughout the First Amended Complaint, [Doc. No. 21], Yarbrough alleges violations of his constitutional right to "bodily integrity" under Section 1983. *See, e.g.,* [Doc. No. 21, ¶ 20].

The Supreme Court has held that the right to bodily autonomy is a fundamental right protected by substantive due process. *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 564 (2003). The fundamental right to bodily autonomy includes the right to be free from physical injury, bodily restraint, and bodily intrusions. *See, e.g.*, *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (physical restraint); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (physical injury).

The Fifth Circuit's history with "bodily integrity" cases began at least as early as 1981, when it held that "the right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir.1981). The *Shillingford* case involved a Section 1983 action by a tourist against a New Orleans police officer. The plaintiff in *Shillingford* was attending Mardi Gras festivities in New Orleans when he attempted to take a photograph of the officer making an arrest. The officer was annoyed and struck Shillingford with his nightstick, inflicting some physical injury. The Fifth Circuit found such action sufficient "to transcend the bounds of ordinary tort law and establish a deprivation of constitutional rights." *Id*. at 266.

Moving forward both in time – and into the context of public education – the Fifth Circuit cited *Shillingford* for this principle of law in *Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir.1987), involving the violation of a schoolchild's

\

substantive due process rights by a teacher. The teacher in *Jefferson* lashed a second-grade student to a chair for the better part of two school days. The Fifth Circuit found that such actions by the teacher violated the student's substantive due process "right to be free of state-occasioned damage to [her] bodily integrity." *Id.* (quoting *Shillingford,* 634 F.2d at 265). The Fifth Circuit has also held that the infliction of corporal punishment in public schools "is a deprivation of substantive due process when it is arbitrary, capricious, or wholly unrelated to the legitimate state goal of maintaining an atmosphere conducive to learning.'" *Fee v. Herndon,* 900 F.2d 804, 808 (5th Cir.) (quoting *Woodard v. Los Fresnos Indep. Sch. Dist.,* 732 F.2d 1243, 1246 (5th Cir.1984)), *cert. denied,* 498 U.S. 908, 111 S. Ct. 279, 112 L. Ed. 2d 233 (1990).

Perhaps the Fifth Circuit's most anchoring case discussing the constitutional right to life, liberty, and bodily integrity is the context of public education is *Doe vs. Taylor Independent School District*, 15 F.3d 443, 450-451 (5th Cir. 1994), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994).   In *Doe,* a minor child who was sexually assaulted by a school-teacher brought a 1983 civil rights lawsuit against the individual schoolteacher, the school district, the superintendent, and the school principal. Doe claimed, *inter alia,* that the defendants, while acting under color of state law, deprived her of her constitutional rights guaranteed by the Fourteenth Amendment's Due Process and Equal Protection Clauses. After the denial of their summary judgment motions on qualified immunity, the superintendent, and the principal appealed claiming they were entitled to qualified immunity because Doe was not deprived of any constitutional right when she was sexually molested by the school biology teacher and – even if Doe was deprived of a

constitutional right – these issues of law were not "'clearly established'" in 1987 when the

assault took place. . . . *Id.* at 450. The Fifth Circuit was clear:

> If the Constitution protects a schoolchild against being tied to
> a chair or against arbitrary paddlings, then surely the
> Constitution protects a schoolchild from physical sexual abuse-
> -here, sexually fondling a 15-year old school girl and statutory
> rape--by a public schoolteacher. Stroud's sexual abuse of Jane
> Doe, earlier detailed in this opinion, is not contested by the
> defendants. Thus, Jane Doe clearly was deprived of a liberty
> interest recognized under the substantive due process
> component of the Fourteenth Amendment. It is
> incontrovertible that bodily integrity is necessarily violated
> when a state actor sexually abuses a schoolchild and that such
> misconduct deprives the child of rights vouchsafed by the
> Fourteenth Amendment. Obviously, there is never any
> justification for sexually molesting a schoolchild, and thus, no
> state interest, analogous to the punitive and disciplinary
> objectives attendant to corporal punishment, which might
> support it.

*Id.* at 451-452.

Synthesizing these principles, Yarbrough's contention is straightforward: if being

tied to a chair is a violation of bodily integrity, and excessive paddling a violation of bodily

integrity, then repeatedly instigating known dangerous football drills against someone who

is older, bigger, and more experienced that involve head to head helmet contact that result

in a severe concussion and traumatic injury is a violation of bodily integrity.

Indeed*, Myers v. Troup Independent School District*, gives succor to Yarborough's

position at the 12(b)(6) stage:

> Plaintiff asserts that his injuries were caused by a state actor's
> affirmative  act of sending him back into a football game five
> minutes after he previously was knocked unconscious and without a
> medical examination. **To the extent that a state actor is alleged to
> have affirmatively caused injury, *Doe v. Taylor Indep. School***

\

> ***Dist.*, 15 F.3d 443 (5th Cir.1994) (en banc), and *Jefferson v. Ysleta
> Indep. School Dist.*, 817 F.2d 303 (5th Cir.1987), apply.**

895 F.Supp. 127, 130 (E.D. Tex. 1995) (emphasis added).

Yarborough is not complaining of being hit by the football player he was up against for doing what he was told to do by the Coach Defendants. Rather, this case arises from (1) the custom and practice of the Coach Defendants to conduct practices and scrimmages which *required* helmet to helmet contact by players of noticeably different size, age, and experience, (2) SFISD's failure to implement a proper concussion protocol and to properly train the Coach Defendants on the prevention of concussions; and (3) the failure of the Defendants to adequately respond in the high likelihood that a student athlete suffers an injury that may result in a concussion.

Rules and regulations exist to protect youth athletes. Defendants intentionally disregarded those rules and regulations which resulted in injuries to Yarbrough and many others at SFISD.

Additionally, Yarbrough contends that he was never properly examined by Defendant Griffin and that Griffin failed to instruct him to seek medical care as required by UIL and the Texas Education Code.

## C.    Plaintiff's Claims are Not an Isolated Injury

Plaintiff objects to the Memorandum and Recommendation's implication that Plaintiff's claims result from an isolated injury in a dangerous sport. Plaintiff is not claiming that an accidental injury occurred on the football field which resulted in a constitutional violation.

\

In 2016, when Chase Yarbrough's injuries occurred, it was well-known, litigated, documented, televised, and publicized that repeated head-to- head contact in football causes concussions and other traumatic brain injuries, including fatal CTE. Indeed, in 2011, the State of Texas enacted laws regarding the training, supervision, prevention, recognition, and treatment of concussions in the school setting. Yet, Defendants intentionally, recklessly, with complete deliberate indifference instructed, orchestrated, required, supervised student athletes to engage in repeated upper body contact over and over again in every practice, at least twice a day which resulted in continued head- to- head contact.

Even more impactful, the football coaches repeatedly directed the players to hit each other hard and harder, repeatedly in dangerous head to head contact drills during numerous practices over a period of weeks that are likely to cause traumatic head injuries. It is well known head to head contact often results in concussions and traumatic brain injury. The Interscholastic League has protocols and safe guards regarding same. Yarbrough's claims do not involve an isolated incident. Yarbrough's claims result from numerous failures to protect his bodily integrity.   His injuries resulted and probably exacerbated, based on the medical report that indicated he suffered a prior concussion, from a systemic failure to protect student athletes in contact sports.

Yarbrough claims that SFISD failed to implement a proper training and protocols to minimize a well-known result of contact sports, namely concussions. Further, when viewing the athletic director, coaches and trainers post head injury is within a high degree of probability that SFISD failed to implement proper training and protocols in the event a student athlete suffers an injury that may result in a concussion. It is a systemic top-down

\

failure that any reasonable entity would seek to avoid.   Indeed, Yarbrough asserted that "Upon information and belief, Yarbrough was not the first or the last SFISD student to suffer a concussion playing football. Many students suffered concussions as a result of the same aggressive play. These concussions were known and/or should have been known by Defendants. Indeed, local health care professionals indicated SFISD is one of the local school districts which has the highest incidents of concussions.   Unfortunately, Yarbrough's case is not an isolated incident" [Doc. No. 21, ¶ 82]

Further, the Memorandum and Recommendation states that no district court in the Fifth Circuit has ever held that a high school athlete suffers a constitutional injury as a result of physical injuries incurred during practice.   Denying a Rule 12(b)(6) motion to dismiss in the context of high school football, Judge Atlas opined "'that if the Constitution protects a student from physical abuse by teachers, it must also protect [a student] from being being run to death' by his coaches in an overly strenuous football practice. . . ). *Roventini v. Pasadena Indep. Sch. Dist.*, 981 F. Supp. 1013, 1021 (S.D. Tex. 1997) (subsequently withdrawn on the parties' own motion at *Roventini v. Pasadena Indep. Sch. Dist.*, 183 F.R.D. 500 (S.D. Tex. 1998)) ((high school football player dies of heat exhaustion after a football practice).

## D.      Defendants Were Aware of an Immediate Danger Facing a Known Victim

Plaintiff objects to the Memorandum and Recommendation in that it states that Yarbrough failed to claim "that the Individual Defendants were 'aware of an immediate danger facing a known victim.'" [Doc. No. 35, page 7]. But instead "zeros in on the overall danger of the sport and the coaches continuously urging players to meet aggression with

\

11

aggression." "Notably, Yarbrough does not complain that the coaches knowingly forced

him to continue contact drills after he suffering a concussion." [Doc. No. 35, page 7].

However, Plaintiff's First Amended Complaint is replete with allegations that

Defendants were aware of an immediate danger facing a known victim:

> In May, 2015, at the end of his eighth-grade year at SFJH, Chase
> Yarbrough underwent a baseline brain assessment test referred to as
> an ImPACT (Immediate Post-Concussion Assessment and Cognitive
> Testing) Clinical Report.   The ImPACT Clinical Report is a
> neurocognitive screening tool which provides diagnostic information
> regarding recovery from injury.   Recovery from concussions is
> difficult to track.   The tracking of recovery following an injury
> requires the analysis of test performance across a number of
> neurocognitive factors.   The ImPACT Report has two components,
> baseline testing and post-injury testing which are used in conjunction
> to determine if an athlete can and when return to the activity safely.
> [Doc. No. 21, ¶ 24]

> SFISD clearly acknowledged and was aware of the dangers of
> traumatic brain injury by implementing the ImPACT Report
> procedures and other procedures adopted from the UIL. [Doc. No. 21,
> ¶ 25]

> ImPACT Clinical Reports and baseline assessments are commonplace
> and required in many private and public schools each year. Indeed,
> SFISD recognized the duties and responsibilities under the UIL and
> the Texas Education Code.   However, Plaintiff claims that
> Defendants failed to properly implement, follow, enforce, and/or train
> appropriate policies, practices, and procedures regarding concussion
> prevention, detection, and treatment. [Doc. No. 21, ¶ 26]

> Indeed, after discussions with Yarbrough and his father, the physician
> concluded that this was not the first concussion that Yarbrough had
> suffered and that he had likely suffered a concussion a few weeks
> earlier and had been practicing and playing with a concussion. It is
> understood and believed that some weeks earlier, Yarbrough
> displayed visible signs of a concussion following a practice.
> Yarbrough began to vomit after practice in clear view of the coaches
> and other players.   However, Defendants failed to take any action to
> check on Yarbrough, remove Yarbrough from play, inform his parents

\

of the condition, or instruct Yarbrough to seek medical care. Instead, Yarbrough continued to participate in practices where head to head drills were required [Doc. No. 21, ¶ 58].

A relationship between Defendants and Plaintiff existed such that Plaintiff was a foreseeable victim of the Defendants' actions, in fact, he was an intended victim, and he was a member of a discrete class of persons subjected to the potential harm brought about by Defendants' actions [Doc. No. 21, ¶ 80].

Yarbrough claims that Defendants used their authority to create a dangerous environment for him and others, and Defendants acted with deliberate indifference to the plight of Plaintiff. Indeed, the environment created by Defendant state actors was dangerous and they knew it was an immediate danger and yet they used their authority to create an opportunity that would not otherwise have existed for the conduct to occur. Defendants knew of and disregarded an excessive risk to Yarbrough's health, safety, and bodily integrity. Clearly, Yarbrough was a known victim of the dangerous environment created by Defendants and Defendants knew an immediate danger existed to Plaintiff's health, safety, and bodily integrity [Doc. No. 21, ¶ 89].

It was clearly foreseeable that by instructing, directing, forcing, and requiring Yarbrough to participate in the organized drills, scrimmages, and practice, that necessarily resulted in helmet to helmet, head to head, and other upper body contact, Yarbrough faced a substantial risk of serious harm, and the Defendants failed to take reasonable steps to enact, implement, train, educate  and/or enforce reasonable policies, practices, and procedures to avoid the  harm. Defendants' affirmative and direct acts of demanding the aggressive drills instructing the kids engage in harder and harder hits and upper body contact, which resulted in head to head and helmet to helmet contact was a causal act of recklessness, deliberate indifference, and/or callousness that caused Yarbrough to be subjected to injury, and specifically to the deprivation of his right to bodily integrity [Doc. No. 21, ¶ 90].

At all times material and relevant hereto, Defendants were aware of and willfully disregarded the inherent and extreme dangers to a student athlete who participates in athletic activities at the direction and instruction of Defendants [Doc. No. 21, ¶ 91].

Defendants failed in their positions of authority, under color of state law, to take appropriate steps to minimize the risk of serious injury to football players such as that actually suffered by Yarbrough [Doc. No. 21, ¶ 92].

Defendants took no reasonable or proper steps to prevent or minimize the risk of harm that Yarbrough actually suffered, but rather directed, required, forced, supervised, and allowed such potentially high–risk activity to occur under the above unreasonably dangerous circumstances with willful disregard and/or deliberate indifference for Yarbrough's health, safety, and bodily integrity [Doc. 21, ¶ 93].

Yarbrough was an intended and obvious member of a class subjected to the harm brought about by the Defendants' actions and/or inactions [Doc. 21, ¶ 94].

By way of Defendants' actions and/or inactions, Defendants utilized their position of authority and power to create a danger to Yarbrough and/or placed him in a more vulnerable manner to the known risk of harm [Doc. 21, ¶ 95].

The Defendants' actions and/or inactions demonstrated an adopted practice, custom procedure, or policy in deliberate indifference to Yarbrough's overall health, safety, welfare, and bodily integrity [Doc. 21, ¶ 96].

As illustrated above, Plaintiff plead that Defendants were aware of and immediate danger facing a known victim. Accordingly, Plaintiff objects to Magistrate Edison's conclusion that Plaintiff did not properly plead allegations.

**E.    State-Created Danger Theory Of Liability**

In the Memorandum and Recommendation, the Magistrate states that the Fifth Circuit has consistently refused to recognize a "state-created danger" theory under § 1983. Plaintiff objects to the over-simplification of Fifth Circuit precedent. It is Yarbrough's core contention that statements by the Fifth Circuit that it has not adopted the theory, in the

\

context of factual circumstances that would not give rise to liability under the theory in any event, are not the same as a holding rejecting the theory altogether.

The Fifth Circuit has had an on-again, off-again embrace of the state-created danger theory.   In a series of cases decided in the immediate aftermath of *DeShaney v. Winnebago County Dept. of Social Serv's.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Fifth Circuit first recognized the existence of, then adopted, the state-created danger theory of liability. *See Johnson v. Dallas Indep. Sch. District*, 38 F.3d 198, 200 (5th Cir.1994) ("When state actors knowingly place a person in danger, the due process clause of the constitution has been held [by other courts] to render them accountable for the foreseeable injuries that result from their conduct, whether or not the victim was in formal state 'custody'"); *Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) (identifying the elements of state-created danger liability and holding that, even if theory was available in this circuit, plaintiff had not met its elements); *McClendon v. City of Columbia*, 258 F.3d 432, 435 (5th Cir. 2001) ("We have not heretofore explicitly adopted and enforced this theory. We do so now"). But the panel opinion in *McClendon*, which expressly adopted the theory, was vacated by the *en banc* court. *McClendon v. City of Columbia*, 285 F.3d 1078 (5th Cir. 2002). The *en banc* court then held that even if the state-created danger theory of liability was available, it was not met in the case. *McClendon v. City of Columbia*, 305 F.3d 314, 325-27 (5th Cir. 2002).

The following year, the Fifth Circuit again acknowledged that it had "never explicitly adopted the state-created danger theory," but it noted that it had previously "set out the elements of a state-created danger cause of action" and then reversed the district

\

court's dismissal of the claim because "even a cursory review of the complaints shows that plaintiffs pleaded facts to establish deliberate indifference," the element of state-created danger liability that the district court found to have been lacking, thereby effectively adopting the theory. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003). In *Beltran v. City of El Paso*, however, the Fifth Circuit noted that it had "consistently refused to recognize a 'state-created danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented." 367 F.3d at 307. The Court then found it unnecessary to settle the issue at the time because "[e]ven if a state-created danger theory were acknowledged in this circuit," the 911 operator defendant had not acted with the deliberate indifference necessary to state a claim. *Id.*

A few years later, another panel of the Fifth Circuit held that *Scanlan* "necessarily recognized that the state-created danger theory is a valid legal theory." *Breen v. Texas A&M Univ.*, 485 F.3d 325, 335 (5th Cir. 2007). But that opinion was then withdrawn in part on rehearing, with the sections of the opinion discussing state-created danger liability deleted. *Breen v. Texas A&M Univ.*, 494 F.3d 516, 518 (5th Cir. 2007).   Subsequently, the Court reiterated that, "[d]espite the potential confusion created by *Scanlan and Breen*, recent decisions have consistently confirmed that '[t]he Fifth Circuit has not adopted the 'state-created danger' theory of liability.'" *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010); *see also Bustos v. Martini Club, Inc.*, 599 F.3d 458, 466 (5th Cir. 2010) ("[T]his circuit has not adopted the state-created danger theory"). Nevertheless, some uncertainly lingers because most of the Fifth Circuit's cases have dealt with factual circumstances that would not give rise to state-created danger liability even if the Circuit recognized the cause

\

of action.

Almost every circuit court of appeals has recognized and adopted some form of state-created danger theory of liability. *See Butera v. District of Columbia*, 235 F.3d 637, 648-49 (D.C. Cir. 2001), n.10 (collecting cases from each of the circuits discussing the state-created danger theory):

> *See, e.g., Frances–Colon v. Ramirez*, 107 F.3d 62, 64 (1st Cir.1997); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir.1993); *Kneipp v. Tedder*, 95 F.3d 1199, 1201 (3d Cir.1996); *Pinder v. Johnson,* 54 F.3d 1169, 1175–77 (4th Cir.1995) (en banc), *cert. denied*, 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995); *Johnson v. Dallas Indep. Sch. Distr.*, 38 F.3d 198, 200–01 (5th Cir.1994), *cert. denied*, 514 U.S. 1017, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066–67 (6th Cir.1998); *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.1993), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992) (en banc), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993); *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Uhlrig v. Harder*, 64 F.3d 567, 572 & n. 7 (10th Cir.1995), *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 567 (11th Cir.1997).

*Id.*

The issues is that Plaintiff's concussion did not onset until the specific high school coaches at issue in this case directed repeated harder upper body contact without appropriate medical attention and training. *See Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 172 (3d Cir. 2017) ("If a jury concluded that Walkowiak was aware of the first blow to Sheldon's head and observed signs of a concussion, the jury could conclude that Walkowiak used his authority in a way that rendered Sheldon more vulnerable to harm by sending him back into the practice session.").

**E.      Plaintiff properly asserted a claim under *Monell***

\

In the Memorandum and Recommendation, Magistrate Edison states that Plaintiff only asserted a claim under the "state created danger" theory of liability. Plaintiff objects to the Memorandum and Recommendation omission of and/or cursory conclusions regarding Plaintiff's *Monell* claims.

Specifically, in addition to state created danger, Plaintiff also claims that the Santa Fe Independent School District is liable under *Monell vs. Department of Social Services of the City of New York,* 436 U.S. 658 (1978).   "Specifically, the School District Defendants' official policies, procedures, practices and/or customs caused the constitutional violation. The extremely dangerous acts and omissions of the coaches and coaching staff were consciously permitted through the policy, custom and/or practice of the School District Defendants' failure to implement, enforce, educate and/or train regarding safety policies as required by law and the UIL, where the custom of competitive high school football took precedence over and constituted a deliberate indifference to the health and safety of Yarbrough and other students. The dangerous policies, customs, practices, rules, regulations of the SFISD and officials included, but are not limited to, the following:

   a.    maintaining inadequate safety policies, customs, practices, rules, and regulations for conducting football practices, scrimmages and drills;

   b.    maintaining policies, customs and/or practices of failing to properly or adequately implement, enforce and/or train the coaches and staff of UIL safety standards, Texas Education Code, and the written concussion protocols of SFISD;

   c.    inadequate and improper policies, customs, practices and/or procedure of failing to maintain proper medical procedures and personnel in place in accordance with recognized protocol and procedures;

\

d.      maintaining policies, customs, practices and/or procedures of failing to teach and practice safe play and proper tackling/defensive technique;

e.      maintaining policies, customs, practices, and/or procedures of failing to follow recognized safe rules and practices of safe play in practices, scrimmages, and drills;

f.      maintaining policies, customs, practices, procedures of maintaining a coaching staff and training staff that was unable and/or unwilling to provide, implement, enforce, and/or instruct proper safety precautions to prevent head to head, helmet to helmet and upper body contact during practices, scrimmages and drills;

g.      maintaining policies, customs, practices, and procedures of emphasizing, instructing, and orchestrating aggressive and unsafe football training, practices and procedures and victories over football safety;

h.      maintaining policies, customs, practices and procedures of inadequately and/or improperly training coaching staff and trainers in the proper and safe maneuver to conduct practices, scrimmages, and drills despite known hazards and dangers;

i.      maintaining policies, customs, practices, and procedures of inadequate training of coaching staff and trainers in prevention, identification, assessment, awareness and treatment and monitoring of the signs and symptoms of concussions and/or head injuries;

j.      maintaining policies, customs, practices, and procedures of allowing coaches to conduct and/or control the conditions and content of practices, scrimmages and drills despite known hazards and dangers;

k.      maintaining policies, customs, practices and/or procedures of failing to properly appoint, approve and/or implement a Concussion Oversight Team (COT) and develop an appropriate Return to Play protocol; and

l.      maintaining policies, customs, practices and procedures of properly and timely removing a student-athlete from practice and/or play immediately when a concussion or head injury is suspected.

The above list is not exhaustive, but illustrative of the policies, customs, practices and procedures of the Defendants" [Doc. 21, ¶ 116].

The inadequacy of Defendants' existing practices, customs, procedures, and policies was so likely to result in violation of Yarbrough's constitutional rights that Defendants can be reasonably said to have been deliberately indifferent to those rights. As a direct and proximate result of the liability producing conduct of Defendants and their wanton and willful disregard for the safety of Yarbrough which shocks the conscience, Yarbrough's suffered those permanent and severe injuries described above, and was deprived of his liberty interest and suffered injury to his human dignity and bodily integrity, without due process of law guaranteed by the Fourteenth Amendment of the United States Constitution. [Doc. No. 21, ¶¶ 116-125]

Indeed, Yarbrough sufficiently stated claims under *Monell v. Department of Soc. Services*, 436 U.S. 658, 690 (1978). It is well-established that 42 U.S.C § 1983 makes liable every person who, under color of state law, violates federal constitutional rights. Under *Monell,* the School District – SFISD – itself must have caused the violation. *Littell vs. Houston Independent School District,* 894 F.3d 616, 622 (5th Cir. 2018).   As illustrated above, Yarborough outlined numerous policies, policies, and customs of SFISD [Doc. 21, p ¶ 116].

Further, in *Littell,* the trial court granted HISD's Rule 12(b)(6) motion to dismiss. After the plaintiffs appealed, the Fifth Circuit reversed. The central issue on appeal was whether the amended complaint stated a claim for municipal liability under *Monell.*   The Fifth Circuit concluded that the plaintiffs sufficiently stated a claim. In so doing, the Court

\

made it clear that the amended complaint must allege sufficient factual content to permit the reasonable inference (1) that the constitutional violation occurred and (2) that an official policy attributable to the school district's policymakers (3) was the moving force behind it. *Littell,* at 623 (citing, *Doe, ex rel. Magee vs. Covington Cty. Sch. Dist. ex. Rel. Keys*, 675 F.3d 849, 654, 866-67 (5th Cir. 2012) (other citations omitted).

Although the parties agreed that a constitutional violation occurred relating to the strip search of middle school girls, the *Littell* Court reasoned that "the Supreme Court established the 'failure to train' method of proving municipal liability in *City of Canton vs. Harris*, 489 U.S. 378, 386-392 (1989). Citing *City of Canton,* the Fifth Circuit made clear:

> Under *Canton,* when a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes 'official policy' that can support municipal liability if it 'amounts to deliberate indifference.' (citations omitted). To prove deliberate indifference at trial, Plaintiffs must show that 'in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers. . .can reasonably be said to have been deliberately indifferent (citations omitted).

*Id*. at 624.

"[D]eliberate indifference" is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). There are at least two ways of proving deliberate indifference. First, municipal/school district employees will violate constitutional rights so often that one can infer from the pattern of violations that the need for further training must have been plainly obvious to the policymakers. Second, even in

\

absent of proof of pattern, deliberate indifference can still be inferred if the risk of constitutional violations was or should have been an obvious or highly predicable consequence of the alleged training inadequacy.[2] However, even in the absence of a pattern, a plaintiff must establish deliberate indifference by showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy of failure to train. *Littell,* 894 F.3d at 624.

In his First Amended Complaint, Yarbrough's claims are facially plausible which will allow the court to draw the reasonable inference that Defendants are liable for the alleged misconduct. Indeed, Plaintiff's claims and allegations track *City of Canton v. Harris* and *Littell.*

## F.     Individual Defendants are Not entitled to Qualified Immunity

Plaintiff objects to the Memorandum and Recommendation that qualified immunity applies to the individual Defendants. The Magistrate again oversimplifies Plaintiff's claims.

The Supreme Court has applied the same qualified-immunity framework for nearly

---

[2] As alleged in *inter alia* Paragraph 17 of the Amended Complaint, the Texas Education Code establishes protocols that were disregarded in by the coaches at issue in this case. *See* Texas Education Code, Subchapter D. Prevention, Treatment, and Oversight of Concussions Affecting Student Athletes, § 38.151, *et seq*. Section 38.153 of the Texas Education Code requires school districts to appoint or approve a concussion oversight team which shall establish a return-to-play protocol, based on peer reviewed scientific evidence, for a student's return to interscholastic athletics practice or competition following the force or impact believed to have caused a concussion. Tex. Educ. Code § 38.153.

\

forty years, since *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   The Court held in *Harlow* that qualified immunity turns on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.*; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017). The Court recently reiterated, in *District of Columbia v. Wesby*, that officials are entitled to qualified immunity unless "every reasonable official would interpret [precedent] to establish the particular rule the plaintiff seeks to apply," placing "the constitutionality of the officer's conduct 'beyond debate.'" 138 S. Ct. 577, 589-90 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

It is well settled that identifying "clearly established" law generally requires "identify[ing] a case where an offic[ial] acting under similar circumstances... was held to have violated the [Constitution]." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). That does not require "a case directly on point," but it does require a case - a body of relevant case law' is usually necessary" - placing the unlawfulness of the particular conduct "beyond debate." *Wesby*, 138 S. Ct. at 589-90.   In addition, "there can be the rare 'obvious case,' where the unlawfulness of the offic[ial]'s conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (quoting *Brosseau*, 543 U.S. at 199).

Plaintiff's claims are not that a substantive due process violation occurred regarding physical injuries sustained at a football practice.   The problem is that Yarborough's allegations are not at all this atomized.   There is puissant caselaw that Yarborough possesses a Constitutional right to "bodily integrity" *See Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir.1987); *Doe v. Taylor Independent School*

\

*District*, 15 F.3d 443, 450-451 (5th Cir. 1994).   These rights have been 'clearly established' in Fifth Circuit caselaw for between 25-30 years.

For the reasons stated above, Plaintiff respectfully submits that Defendants' Motion to Dismiss Pursuant to Rule 12(b) should be denied.

## CONCLUSION

Plaintiff respectfully objects to the Magistrate Judge's Memorandum and Recommendation findings: (1) that there is no constitutional violation; (2) that state created danger is not an available remedy; and (3) that the individual Defendants are entitled to qualified immunity. Plaintiff respectfully asserts that the Defendants' Motion to Dismiss should be denied.

Respectfully Submitted,

**THE CHANDLER LAW FIRM, L.L.P.**

*/s/ Sherry Scott Chandler*
_____
Sherry Scott Chandler
State Bar No. 17915750
Lewis M. Chandler
State Bar No. 24036350
4141 Southwest Freeway, Suite 300
Houston, Texas 77027
Telephone: (713) 228-8508
Facsimile: (713) 228-8507
sherry@chanderlawllp.com
lewis@chanderlawllp.com

\

**SOUTHERLAND LAW FIRM**

*/s/ J. Alfred Southerland*

_____

J. Alfred Southerland
State Bar No. 18860050
4141 Southwest Freeway, Suite 300
Houston, Texas 77027
Telephone: (281) 928-4932
Facsimile: (713) 228-8507
alf@southerlandlawfirm.com

**LAW OFFICES OF SETH KRETZER**

*/s/ Seth Kretzer*

_____

Seth Kretzer
State Bar No: 24043764
9119 South Gessner; Suite 105
Houston, TX 77074
DIRECT: 713/775-3050
seth@kretzerfirm.com (email)

**COUNSELS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 17th day of June, 2021, a true and correct copy of the attached and foregoing document was served on all counsel of record in accordance with the Federal Rules of Civil Procedure as follows:

Clay T. Grover
State Bar Number 08550180
cgrover@rmgllp.com
Amy Demmler
State Bar Number 24092337
ademmler@rmgllp.com
Rogers, Morris & Grover, L.L.P.
5718 Westheimer, Suite 1200
Houston, Texas 77057
713-960-6000 Telephone
713-960-6025 Facsimile

\